ANDREW, J. T. C.
In this local property tax proceeding plaintiff seeks a reduction of an alleged over-assessment of various parcels of vacant land for the tax year 1976 based on a “cost of development” method of valuation.
The property consists of 37 vacant lots aggregating approximately 203.41 acres in Shrewsbury Borough. Of the 37 lots, 36 are residential in character, ranging in size from 1.03 acres to 1.80 acres located to the east of New Jersey Route 35, also known as Broad Street, in the borough. The 36 lots have, for the most part, been improved with all underground utilities, streets, sidewalks, curbs and gutters. Only four lots, located at the end of Willow Court, are not on an improved roadway. Some of the lots are affected by a 100-foot drainage easement while others are affected by adjacent adverse uses, traffic conditions and an adverse view. The remaining lot, approximately 161 acres in size, is undeveloped, partially wooded and located within the equivalent of three different zoning districts pursuant to the zoning map of the borough.
One portion of this large parcel is located in the R-l zone of the borough. This segment is approximately 77.5 acres and its *546 highest and best use as permitted by zoning is for single-family residences. The balance of this undeveloped, large tract lies within what has been denominated a Limited Industrial Research Zone (LIR 88) by the borough zoning map and plan. This zone permits certain commercial uses within the area of 800 feet from the easterly curbline of Broad Street. The particular area of the subject that falls within this “commercial” portion of the LIR 88 zone consists of 23 acres.
The remainder of the 161 acres, or 60.5 acres, is limited to scientific, engineering and/or research laboratories.
The various block and lot designations, assessments and actions of the Monmouth County Board of Taxation for the tax year of 1976 are included in the file of this action on a document designated as Exhibit A. The assessments in the aggregate, however, were $1,581,500.
Each party relied upon the testimony of one valuation expert. Taxpayer’s expert offered his opinion of value based on the “cost of development” methodology, while borough’s expert relied exclusively on the market data or direct sales comparison approach to value.
Taxpayer’s expert initially considered the value of the 36 residential lots which had previously been subdivided along with that portion of the large undivided parcel zoned for residential use. He utilized a “cost of development” method to value the latter. It was his opinion that there were no sales of truly comparable property. He concluded, therefore, that the market data approach was inappropriate and that his approach to value was proper.
This method of estimating the value of vacant land for subdivision purposes has also been referred to as a subdivision method or the anticipated use method. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978) 147; Fuller, “Appraisal of a Proposed Residential Subdivision Development,” in Friedman, Encyclopedia of Real Estate Appraising (3 ed. 1978) 662. The value of the land to be subdivided is estimated in the following manner:
*547 1. Identify the economic bracket of the residents and check the range of sales prices of typical new homes in the area.
2. By distribution, or comparison with lot sales in similar subdivisions, decide what figure represents a typical lot value in this category of development.
3. Study and lay out a subdivision plan to develop typical lots.
4. Project the total probable gross sale price for these lots.
5. Estimate development costs to include:
a. Engineering or other fees
b. Cost of streets and utilities
c. Advertising and cost of sales.
6. Estimate overhead and administrative costs to include:
a. Taxes and inspection fees
b. Financing fees and carrying costs.
7. Deduct an adequate profit allowance to provide incentive for the developer so that the calculated value of the raw land is exclusive of development profit. (Alternatively, profit may be provided for in the rate used for capitalization in the discounting process.)
8. Deduct for time lag by discounting, at an appropriate risk rate, the annual net income flow over the time needed for completion and market absorption of the project. [The Appraisal of Real Estate, supra at 148].
Since the lots in the subdivision will be sold over a period of time, an absorption study is critical to indicate the time required to market the subdivided portions. Ibid. •
Taxpayer’s expert estimated that the residential portion of the large undivided tract would yield 53 lots which, when added to the 36 previously subdivided lots, would total 89. He developed a market value for these lots based upon three sales of improved residential property. In order to arrive at a land value for the subject lots based on the sales of improved comparables, he used what he referred to as an “abstraction.” He accepted the existing assessment ratio of land value to building value, as established by the assessor, for each of the comparable parcels. The ratios were then applied to the sales prices in order to determine the value to be attributed to the land. It was noted on cross-examination that this approach was dependent upon the correctness of the land-to-building ratio established by the assessor of the taxing district wherein the comparable properties were located. From this information he “abstracted” from the total selling prices a price for each improved lot. These prices indicated to him that a value of *548 $18,500 for each of the subject lots “would be consistent with the market.”
It was the opinion of the taxpayer’s expert, however, that the market could not absorb all 89 lots within a reasonable period of time. He projected that these lots would be absorbed at the rate of approximately six to seven a year until the year 1990. He based his absorption or sell-off rate on the population growth statistics of the area and the economic base reports published by the Monmouth County Planning Board. He also felt that competition from two other residential subdivisions in the area would affect the rate at which the taxpayer could dispose of the lots.
The value of $18,500 a lot, therefore, required adjustment based on the rate of absorption, the projected selling prices in the future, the cost of development, promotion and merchandising in the form of real estate brokers’ commissions, the owners’ overhead and profit, and the discount or risk rate.
Taxpayer’s expert estimated that the base value of the lots would increase at a- rate of 4% a year compounded annually. This rate was derived from his experience. He utilized development costs provided to him by the taxpayers which were derived from the actual costs incurred in the subdivision of the previously subdivided 36 lots during the 1972 to 1974 time period to determine lot development cost for the undeveloped lots.
His discount or risk rate was based on a band of investment technique, applying a 10% mortgage rate for two-thirds of the value and an equity dividend rate of 14.5% for the balance of one-third, giving rise to an overall rate of 11.5%. He then added 3.5% to adjust for real estate taxes, and this produced a total discount rate of 15%. No specific support was given for any of these estimates other than the expert’s experience.
He assumed that real estate brokers’ commissions at the rate of 6% of the selling price would cover the cost of promotion, advertising and merchandising, and that an allowance of 9% of the sales prices to be obtained would adequately satisfy the taxpayer’s entrepreneurial or development profit. This assumed *549 total of 15% was not supported by any factual basis, either in the testimony of the expert or in his appraisal report.
Taxpayer’s expert proceeded to value the vacant land located in the commercial portion of the LIR 88 zone (23 acres of the large undeveloped tract fronting on Route 35 or Broad Street) in much the same manner. He estimated that the 23 acres could be subdivided into four lots, but again, due to the limited population growth in the area of the taxing district, he concluded that the development or sell-off rate would be slow. He valued this portion of undeveloped land at $35,000 an acre, presumably based on two sales of commercial property that had occurred in the area of the subject. However, no specific mention was made of this particular value estimate, nor were any adjustments demonstrated between the subject and the comparable properties. As with the residential property, he proceeded to project an increase in value at 4% a year compounded annually to reflect increase in land value and the period of time necessary to sell off the projected four lots.
His cost to develop this segment of the tract was considered negligible, while merchandising and owners’ profit was considered to be 15%, as with the residential land. The same discount rate was used to project present worth of the future sales anticipated to occur over the period of 12 years.
The last portion of vacant land, identified as LIR 88 Interior Land, consisting of approximately 60.5 acres, was valued by taxpayer’s expert by the same methodology.
He utilized a plan of development which reflected a division of this land into 20 lots. There was some question as to the exact nature of the permitted zoning uses, namely, whether this land was zoned light industrial or research and design, but both experts indicated that both uses were of the same basic type. He projected a sell-off rate at one a year. He accepted the taxpayer’s projected sales prices and estimated costs of development. Thereafter he applied the same merchandizing costs, developer’s profit and discount rate. His concluded value estimate for all 37 lots was in the aggregate sum of $1,135,000, which he classified into individual values.
*550 Borough’s expert relied upon six sales of comparable commercial property in support of his value conclusion of the frontage portion or commercial portion of the land 800 feet in depth from Route 35 or Broad Street (23 acres). His valuation estimate, made after unexplained and undemonstrated adjustments, was $25,000 an acre. He felt that the most comparable sale was one which occurred in February 1973, about 2V2 years prior to the relevant assessment date of October 1, 1975. This was a sale of a five-acre parcel fronting on Broad Street for $150,000, with the grantee paying the real estate broker’s commission of $15,-000. This demonstrated a value of $33,000 an acre. He adjusted this sale downward to arrive at his value of $25,000 an acre and felt that the other sales he cited supported his value indication.
It was demonstrated, however, on cross-examination, that although commercial uses were permitted on the 23 acres, shopping centers were prohibited. Borough’s expert explained that his conclusion of value took this into consideration, but specific adjustments were not demonstrated.
He then valued the portion zoned for light industrial (60.5 acres) by means of five sales of what he believed to be comparable properties. These sales, after unexplained and undemonstrated adjustment, indicated a value judgment of $9,000 an acre for the subject.
It was indicated on cross-examination, however, that the sales involved properties located in a B-4 zone, which is a standard light industrial zone while the subject is zoned for light industrial research. It was conceded that a B-4 zone provides for a somewhat broader use than the subject zone and therefore the subject would not be as desirable as B — 4 zoned parcels. The expert contended that he considered the differences between a light industrial zone and the uses permitted in the LIR 88 zone of the subject in arriving at his final value estimation of $9,000 an acre.
He then valued the 77.5 acres located in the residentiallyzoned portion of the large undeveloped tract at $5,000 an acre *551 based on two sales of large acreage in nearby municipalities. These sales produced unit prices of $8,600 and $6,200 an acre, respectively. After unexplained and undemonstrated adjustments, the expert concluded that the value of the residential portion of the large undeveloped tract was $5,000 an acre.
In the valuation of the 36 improved lots he relied on five sales of comparable sites which ranged in unit price from $18,000 to $25,000 an acre. He felt that the subject lots were comparable at the lower end of this range and concluded a value of $18,000 an acre for the individual lots, which he adjusted downward for various detrimental influences on individual lots. Again, the adjustments were unexplained and undemonstrated.
Borough’s expert concluded that the value of all the vacant land in the aggregate was $1,970,500. Although his total value exceeded the total assessment for 1976, his breakdown of individual values reflected that assessments on ten of the residential lots were in excess of what he considered to be market value as of the assessment date of October 1, 1975.
The dispute between the parties requires the court to initially consider the subdivision or development method of valuing vacant land.[1] Traditionally, the most acceptable approach to the value of vacant land has been the market data or direct sales comparison approach. The Appraisal of Real Estate, supra at 141, 147. However, it has been said on any number of occasions that there is no single doctrinaire approach to valuation of real property. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 72, 208 A.2d 153 (App.Div.1965). Ultimately we are seeking to find the true value of the property, specifically, the price a hypothetical willing buyer would pay a hypothetical willing seller on October 1 of the pretax year. New Brunswick v. Tax Appeals Div., 39 N.J. 537, 543, 189 A.2d 702 (1963). An expert is not limited to the traditional approaches to value if his knowledge and experience, adequately supported, can be of *552 assistance in regard to the critical issue of that price which hypothetical parties will use as an exchange for real property on the assessment date. Samuel Hird & Sons, Inc. v. Garfield, supra 87 N.J.Super. at 72, 208 A.2d 153; Passaic v. Gera Mills, 55 N.J.Super. 73, 75, 85, 150 A.2d 67 (App.Div.1959), certif. den. 30 N.J. 153, 152 A.2d 171 (1959).
This court must consider those factors which a purchaser in the market place would consider for the purpose of determining to what extent, if any, those factors affect the value of the land. A purchaser would unquestionably take into consideration in estimating what he would pay for a particular parcel the availability of the site for subdivision. If such matters would be considered by a reasonably prudent business man in selling, buying or valuing real estate, a court, in adopting the standards of the market place in making valuation determinations, should not close its eyes to how the market place arrives at and applies the standards.
As our Supreme Court indicated in New Brunswick v. Tax Appeals Div., supra 39 N.J. at 551, 189 A.2d 702, it is not for the trier of the facts to decide abstractly what an investor should want but rather what an investor demands and obtains in a transaction with a willing seller.
Although the court concludes that it cannot reject summarily the valuation methodology advanced by taxpayer’s expert, this does not permit an expert to roam at large in the realm of fancy and to testify at length about hypothetical developments which are not undergirded factually. The test should be what factual information a person of ordinary prudence desiring to purchase real estate would rely upon in making a determination as to the price he will pay. Speculative hopes and plans for the future could be more illusory than real and as such have no place in value determinations.
The difficulty this court has with the thesis of taxpayer’s expert is its lack of factual foundation. The opinion of an expert depends upon the facts and reasoning which form the basis for his opinion. Passaic v. Gera Mills, supra 55 N.J.Super. at 89-90, 150 A.2d 67.
*553 Initially, taxpayer’s expert relied upon a method he called “abstraction” in order to arrive at land value for the residential lots. This was a misnomer. The principle of abstraction requires an appraiser to estimate a building value in a comparable sale by means of the cost approach and then deduct such appraised improvement value from the total sale price in order to arrive at the putative land value for the comparable sale property. The portion of the sale price allocated to land is treated as if it were the price obtained in an actual sale of vacant land. The Appraisal of Real Estate, supra at 147. The method by which the taxpayer’s expert attempted to extract land value was dependent upon the ratio of land to building value established by the assessor of the taxing district in which the comparable property was located. There was no way to test this allocation. It is bereft of credible support. If the assessment ratio were incorrect, so also is the value estimate of taxpayer’s expert. In effect, we have one expert testifying to the opinion of another expert without the benefit of examination of the first estimate of value. See State v. Lichtman, 66 N.J.Super. 386, 169 A.2d 184 (App.Div.1961). This procedure does not assist the court in fixing market value.[2]
Next, taxpayer’s expert projected that his base value for the residential lots would increase at a rate of 4% a year compounded annually. There was no factual support for this estimate. It could have just as easily been 2% a year or 6% a year. It is difficult enough to estimate value in the present. Taxpayer’s expert projected prices obtainable 15 years in the future based solely on his experience. I find this to be of no aid to the court.
Taxpayer’s expert based his absorption or sell-off rate of six to seven residential lots a year on population growth. He did not, however, offer a factual basis for this conclusion other *554 than to cite the estimated population growth statistics. It was indicated on cross-examination that the previously subdivided lots were never offered for sale individually, but only in bulk parcels. Since there was very little residential land available in the borough it is conceivable that the taxpayer restricted its supply to developers and therefore reduced the market demand for individual lots. This was not fully explained by taxpayer’s expert. In any event, I find that his projected absorption rate lacked factual support.[3]
Taxpayer’s expert relied totally on cost figures given to him by the taxpayer for the original subdivision of the 36 residential lots. This court has no way of determining what these hearsay costs included or whether they were reasonable or inflated. They were not subject to examination. There is additionally no way this court can conclude that such costs could be applied on a per lot basis to other land which may be totally different and which may require more or less expenditure of time and money to improve. I find this estimate to be lacking in sufficient factual support.[4]
I find that the discount rate of 11.5% suggested by taxpayer’s expert was totally devoid of any factual support, as was his estimate of developer’s profit. These elements must have a foundation obtained from the market. The court is unable to test estimates that find support in the experience of the witness.[5]
Taxpayer’s expert added 3.5% to his overall rate to allow for real estate taxes. This was based on the tax rate in existence for the tax year 1976, assuming an assessment ratio of *555 100%. He made no adjustment for tax rate increases or assessment ratio decreases over his projected absorption period of 15 years. I find this to be without reasonable support.
The findings that I have made with regard to the residential land apply with equal force to the value estimations of taxpayer's expert relative to the land in the LIR 88 “commercial” zone or frontage portion and the LIR 88 interior land. It is noteworthy that there is even less basis for his absorption rates and projected selling prices relative to these parcels. Additionally, he accepted the taxpayer’s estimated costs of development and the taxpayer’s projected selling prices for the 20 lots in the interior land portion of the LIR 88 zoned property. No purchaser would rely on this self-serving information in a determination of price nor can this court.
I find that a purchaser of ordinary prudence would not rely upon the estimation of value submitted by taxpayer’s expert because it lacks the detailed facts and figures necessary to establish economic feasibility and reasonable probability of achievement. The lack of factual support renders the value estimation speculative, conjectural and fanciful and of no assistance to this court in making a value determination.
Borough’s expert relied upon the more traditional approach to the valuation of vacant land in his use of the market *556 data approach. However, he failed to provide a basis for his adjustments, whether in dollars or cents or by percentage, between comparable sales upon which he relied and the subject. He also failed to state the factors which entered into his judgment. No attempt was made to show value adjustments for differences in time intervals, location, physical or economic similarities and/or dissimilarities, or conditions surrounding the comparable sales.
I find that I must reject the opinion of both experts in this matter. The failure of borough’s expert to make known his adjustments with respect to the properties which he presented as comparable and his failure to state the factors which entered into his judgment preclude this court from a determination of the legality and propriety of the bases for adjustments as well as the quantum.
The burden is on the taxpayer in this matter to establish that the true value of the subject property is at variance with the judgment of the Monmouth County Board of Taxation. Glenwood Realty Co., Inc. v. East Orange, 78 N.J.Super. 67, 187 A.2d 602 (App.Div.1963). I find that plaintiff has failed to prove by a preponderance of the evidence that the subject property is assessed in excess of its fair market value.
The Clerk of the Tax Court is directed to enter judgment affirming the Monmouth County Board of Taxation.

This method has been frequently criticized because of its hypothetical nature. International Association of Assessing Officers, Property Assessment Valuation 97 (1977).

 A market study could have been made of other subdivisions that were comparable to the subject, and the fair market value of individual lots derived therefrom. See, Fuller, “Appraisal of a Proposed Residential Subdivision Development, ” supra at 662-63.

Richard A. Fuller, MAI, suggests that a thorough study be made as to the rate of sales in comparable subdivisions in the area of the subject in order to establish absorption or sell off rate. Fuller, “Appraisal of a Proposed Residential Subdivision Development, supra at 663.

 Fuller suggests that an analysis of direct costs necessary to subdivide a site is generally prepared by a qualified engineer, contractor, or appraiser familiar with the cost of construction in the area of the subject. Ibid.

 On this point L. W. Ellwood has stated:
*555 I believe experience can teach lessons which may lead to sound judgment. I believe sound judgment is vital in selecting the critical factors for appraisal. But, I also believe the bright 17 year old high school student in elementary astronomy can do a better job estimating the distance to the moon than the old man of the mountains who has looked at the moon for 80 years. So, I find it difficult to accept the notion that dependable valuation of real estate is nothing more than experience and judgment. I would not give a red cent for an appraisal by the ‘expert’ who beats his breast and shouts: ‘I don’t have to give reasons. I’ve had 40 years experience in this business. And, this property is worth so much because I say so.’ After all, value is expressed as a number. And no man lives who, through experience, has all numbers so filed in the convolutions of his brain that he can be relied upon to choose the right one without explicable analysis and calculation.
[Ellwood, Ellwood Tables xiii (1977)]