807 A.2d 257 (2002)
354 N.J. Super. 387
ALPINE COUNTRY CLUB, Plaintiff-Respondent/Cross-Appellant,
v.
BOROUGH OF DEMAREST and Borough of Alpine, Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 18, 2002.
Decided October 11, 2002.
*258 James P. Logan, Englewood, and John J. Langan, Jr., argued the cause for appellants/cross-respondents (Logan, Logan & Lindsay, Englewood and Decotiis, Fitzpatrick, Gluck, Hayden & Cole, Ramsey, attorneys; Mr. Logan and Mr. Langan, on the brief).
Edward G. Rosenblum, Springfield, argued the cause for respondent/cross-appellant (Rosenblum, Wolf, and Lloyd, attorneys; Mr. Rosenblum, on the brief).
Before Judges PRESSLER, WALLACE, and AXELRAD.
The opinion of the court was delivered by AXELRAD, J.T.C. (temporarily assigned).
Defendants, Boroughs of Alpine and Demarest (municipalities), appeal, and plaintiff taxpayer, Alpine Country Club, cross-appeals, from the Tax Court's determination of value of an eighteen-hole golf course with improvements for the tax years 1992 through 1996. The 188-acre tract of land under appeal consists of one lot of 33 acres in the Borough of Alpine and three lots totaling 155 acres in the Borough of Demarest. Taxpayer had brought Tax Court complaints on three lots in Demarest and one lot in Alpine for tax years 1992, 1995, and 1996, and for the Alpine lot in 1994. Demarest had brought Tax Court complaints on the three Demarest lots for tax year 1993.
Both experts agreed the property should be valued as a single entity, and the highest and best use of the entire parcel would be as a residential subdivision. *259 Taxpayer's appraiser initially used the three traditional approaches to value, i.e. sales comparison, income capitalization, and cost, concluding the highest and best use of the property was as a golf course/country club. During trial he modified his highest and best use analysis and testified as to the discounted cash flow (DCF) subdivision development analysis. Municipalities' appraiser addressed all approaches but relied only on the subdivision approach to calculate the fair market value of the property, relying on our affirmance of this approach as an appropriate method for determining the valuation of a country club with the highest and best use as a residential subdivision in Tamburelli Properties Ass'n v. Cresskill, 15 N.J.Tax 629 (Tax 1996), aff'd, 308 N.J.Super. 326, 705 A.2d 1270 (App.Div.1998).[1] After a lengthy trial, the Tax Court reduced five property tax assessments and affirmed eleven.
Municipalities in a joint brief contend (1) the taxpayer's complaints should be dismissed for failure to present sufficient proof to overcome the presumption of correctness of the assessments; (2) the court's adoption of the "rule of thumb" formula proposed by an attorney-developer, a fact witness proffered by municipalities, resulted in erroneous fair market values; (3) the court erred in not accepting the method of valuation and conclusion of value of municipalities' appraiser; and (4) the taxpayer's complaints should have been dismissed for failure to present value based on accepted methods of appraisal. In the cross-appeal, taxpayer argues (1) the court erred in adopting and applying the "rule of thumb" formula and (2) the court failed to make adequate findings of fact.
In its October 25, 1999 bench opinion, the Tax Court found "that the sales used by [taxpayer's expert] in his sales comparison approach neither separately nor together produce a persuasive indication of the value for the subject." We note that "judges presiding in the Tax Court have special expertise; for that reason their findings will not be disturbed unless they are plainly arbitrary or there is a lack of substantial credible evidence to support them." Glenpointe Assoc. v. Township of Teaneck, 241 N.J.Super. 37, 46, 574 A.2d 459 (App.Div.), certif. denied, 122 N.J. 391, 585 A.2d 392 (1990). We affirm these findings and conclusion for the reasons articulated by the Tax Court in its detailed analysis of the sales comparison approach. We therefore conclude the assessments cannot be challenged on this basis.
We find the Tax Court erred, however, both procedurally and substantively, in adopting the "rule of thumb" formula espoused by the fact witness as the sole basis for determining the value of the subject property. We reverse and remand to the Tax Court for a determination of value without consideration of the fact witness' testimony as to the "rule of thumb" formula. If the court determines the expert testimony supports the use of the DCF subdivision development analysis as the appropriate approach to calculate the fair market value of this parcel, it shall follow the accepted components of that methodology as recognized by the appraisal community in its authoritative publication and by our courts, and determine true value. Appraisal Institute, The Appraisal of Real Estate 342-46 (12th ed.2001); Tamburelli, supra, 308 N.J.Super. at 333-34, 705 A.2d 1270; Genola Ventures-Shrewsbury *260 v. Shrewsbury, 2 N.J.Tax 541 (Tax 1981). If, however, the Tax Court determines the proofs are insufficient to find value because there is a lack of factual foundation for one or more of the assumptions utilized by the experts in their DCF analysis and neither party has submitted reliable evidence for purposes of establishing true value, the court shall affirm the assessments, as did Judge Andrew in Genola Ventures, supra, 2 N.J.Tax at 556. The court may accept such supplemental certifications or testimony as it deems appropriate.
In his opinion the judge correctly articulated the nature of the subdivision development analysis, i.e., "an application of discounted cash flow analysis in which revenues and expenses together with an allowance for profit are projected over a development period and then discounted back to a valuation date to arrive at a value estimate for undeveloped land," referencing the methodology as described in greater detail in the Appraisal of Real Estate, Eleventh Edition, and the Genola and Tamburelli cases. Under the traditional subdivision development analysis, as set forth in Genola, and which we affirmed in Tamburelli, the appraiser undertakes the following steps:
(1) based on a review of zoning ordinances, comparable subdivision maps and information, and preliminary development plans or other engineering studies for the hypothetical subject subdivision, determines the number and size of lots that can be created physically, legally, and economically;
(2) projects the probable gross sales price for the lots and multiplies that value times the number of lots;
(3) estimates the development costs, which include engineering fees, streets and utilities, and advertising and costs of sales;
(4) estimates overhead and administrative costs;
(5) deducts an adequate profit allowance to provide incentive for the developer; and
(6) deducts for lag time by discounting, at an appropriate risk rate, the annual net income flow over the time needed for completion and market absorption of the project.
[Tamburelli, supra, 308 N.J.Super. at 333-34 n. 2, 705 A.2d 1270; Genola Ventures, supra, 2 N.J.Tax at 547.]
The trial judge, however, chose not to use this analysis because, as he explained, unlike Tamburelli, the differences between the appraisers as to the component elements in the DCF calculation were "more numerous and of a greater magnitude" and "in many instances the factors that they employ rest upon subjective opinion rather than verifiable data." Instead, as the sole valuation approach for the subject parcel, the judge utilized what he classified as a modified subdivision development analysis derived from the testimony of John Mavroudis, an attorney and investor in large upscale developments in Bergen County who was the developer in one of the comparable sales relied upon by taxpayer's appraiser, the so-called Norwood tract.
Mavroudis was produced by municipalities as a fact witness, primarily to testify as to the specific facts relating to the Norwood sale in support of municipalities' claim it should not be considered as a comparable sale. When municipalities' counsel inquired as to the formula Mavroudis used as a developer to determine the relationship between what he expected to receive for a finished lot and what he would pay for the entire undeveloped tract, taxpayer's counsel repeatedly objected. Taxpayer's counsel's objections were in part based on an assertion that Mavroudis' testimony was in the nature of expert testimony *261 for which Mavoudis had not been qualified and for which no report had been submitted. In response to the objection, counsel for the municipality assured the court he was not asking for Mavroudis to be qualified and testify as an expert, but only to relate his business experience. The judge ruled,
So if youif you want to just generally establish who Mr. Mavroudis is that Mr. Politi [munipalities' [municipalities] appraiser] had this conversation with, go ahead, but I think that the substance of his testimony concerning any data that you want considered has to be connected with Politi and it has to be shown that Politi relied upon it or it could be the most relevant testimony in the world concerning the value of this property, and I can't consider it because the expert didn't consider it.... You can't use this man as a back door witness as to the value of the subject. You can only use him to testify concerning the particular circumstances of the Norwood sale and also concerning such information as he may have provided to Politi.

[Emphasis added.]
Mavroudis testified the formula he had used in determining the purchase price of approximately 1000 acres of undeveloped land in Bergen County, including the Norwood tract, is 50% of the total revenue projected to be realized from the development less the hard and soft costs of the development process. He explained that he would
make a market analysis of the gross sale on a piece of property, divide that in half, and then analyze what the development costs would be to bring it to the point where it could be marketed. Subtract those development costs and then you wind up with what is perceived to be what you could purchase the property for.
At different points in his testimony, Mavroudis indicated the development costs might range between 10% to 20% or 15% to 25% of the fifty-percent figure and regarded the 19% experienced in the Norwood project as extraordinarily high.
Even though not classified as such by either Mavroudis or the experts, the Tax Court regarded this "rule of thumb" approach as a modified application of the subdivision development model, employing a "less complicated and more generalized calculation." According to the court,
If the more detailed approach were to be employed directly, the rule of thumb would be a useful cross check. But on the record of this case, however, I conclude that the rule of thumb should be used not simply as a cross check or corroboration of the more detailed model but rather that it should be recognized as a useful modification of the approach and employed directly to derive value.

....
In the particular circumstances of this case the record provides a credible basis to determine total revenue from the residential subdivision and also the costs of development. The 50 percent factor employed in the rule of thumb reflects the practical judgment of an experienced and knowledgeable property developer. As such, I conclude that it has credibility.

[Emphasis added.]
The judge applied this "modified" valuation formula separately for the property in each municipality, "calculating first the anticipated revenues and then adjusting by the 50 percent rule of thumb factor and then deducting the development costs." To establish total revenue, the trial judge accepted the stipulation that 25 lots could be developed in the Alpine portion of the *262 property and adopted the municipalities' expert's estimate of 106 developable lots in the Demarest portion. As to the selling prices of the building lots of the kind projected for sale as of the 1992 assessment date, he also accepted municipalities' appraiser's conclusion of $390,000 for lots in Demarest and $448,500 for lots in Alpine, and municipalities' engineer's infrastructure development cost estimate of $7,293,700 for Demarest and $1,545,100 for Alpine. The judge did not attempt to project a pattern of sales or price variations over the selling period. For each municipality, he then multiplied the number of lots by the finished lot price and divided the product by two. From that figure, he deducted the infrastructure costs to arrive at an indicated market value. The judge kept the value from 1992 to 1993 constant, and applied a 5% annual appreciation factor for each year following 1993.[2]
The trial court erred in adopting this "rule of thumb" as the sole approach for determining the fair market value of the subject parcel for a variety of reasons. Lay testimony may not usurp the function of expert opinion. N.J.R.E. 701, 702. Municipalities offered Mavroudis solely as a fact witness and the court expressly accepted him only as such. On numerous occasions taxpayer's counsel appropriately objected to the scope of Mavroudis' testimony based on lack of knowledge of the specific fact about the subject parcel, lack of foundation, and lack of expertise, as well as a violation of the principles of "fundamental fairness." No expert report was provided as required by R. 8:6-1, and the scope of Mavroudis' testimony at trial was expanded far beyond that addressed in depositions, adversely impacting the ability of taxpayer's counsel to effectively cross-examine this witness or present rebuttal testimony by another investor as to his or her guideline for purchasing property. The court's error is clear, in light of its express findings and acceptance of Mavroudis only as a lay witness, after objection and municipalities' counsel's repeated representations on the record that Mavroudis was not being offered as an expert and his testimony was not being offered to prove value.
Furthermore, even if the judge were inclined to give some credence to Mavroudis' theory as a cross-check of the appraisers' assumptions and projections, he should have kept in perspective that Mavroudis is not a certified real estate appraiser and never claimed to have that expertise. N.J.R.E. 702; Kemp v. State, County of Burlington, 174 N.J. 412, 809 A.2d 77 (2002). Mavroudis is simply a developer who uses this "rule of thumb" as a guideline based on his own general experience when looking at potential sites for development. To his credit, Mavroudis never sought to elevate his theory to a general principle of real estate appraisal valuation. Moreover, there was never any claim that this investor's theory was an accepted methodology relied upon by appraisers or even other developers, or commented upon or adopted in any authoritative texts or case law in this State. In addition, municipalities' appraisal expert never testified he relied upon Mavroudis' theory in arriving at value or incorporated it into his subdivision development analysis. To the contrary, municipalities assert on appeal the judge erred in not accepting all elements of its expert's subdivision development analysis, and he created a deficient formula *263 by taking two of its components first year per lot value and infrastructure costsand incorrectly inserting them into Mavroudis' formula.
In addition, Mavroudis never related his "rule of thumb" theory to the specific characteristics of the tract under appeal and never opined this formula would be appropriate for setting the value of the subject. As the record clearly indicates, Mavroudis' conversations with municipalities' appraiser were in an entirely different context:
BY MR. LANGAN [municipalities' counsel]:
Q: Mr. Mavroudis did Mr. Politi [municipalities' appraiser] advise you that the subject that he was talking about was 131 lot subdivision on the East Hill, the Alpine Country Club?
A. He advised me that thethe discussionthat his interest was concerning the Alpine Country Club. But we discussed generally, you know, the ... northeast part of the county and what the absorption period for the sale of lots in municipalities in that county would be as but we didn't speak specifically about 131 lots in this particular site.
....
A. The only discussion we had about the Alpine Country Club waswas the issue of desirability of lots in that location, not specific development costs or any kind of method of development approach or applications which we made.
On cross-examination, Mavroudis further acknowledged that his discussion with municipalities' expert regarding projection of the approval period required for a large tract development "was general in nature" and did not pertain directly to the proposed subdivision of Alpine Country Club. Additionally, Mavroudis did not ask municipalities' expert any questions or make any analysis as to the extent of wooded areas or other aspects of sensitive nature of the subject site, which "would impact the potential for opposition" to development, as in the Norwood sale.
As a further illustration of the problems attendant in the use of Mavroudis' theory in valuing the subject premises, we note, but need not address, both parties' contentions on appeal that the formula is not even applicable to the subject property, and the judge erred in applying it. Mavroudis' theory assumes a contingency for development approvals and contemplates that the purchase price is not paid until preliminary approvals are secured. Without any approvals, Mavroudis would not make an offer, unless the price was adjusted. Accordingly, taxpayer reasonably asserts the formula could not be applied to the subject property without discounting the price, as the tract did not have approvals as of the assessment dates. Municipalities reasonably assert the "rule of thumb" formula is not applicable to this property without recognizing a multi-year sellout period with lot appreciation and discounting the costs that will not be spent in just one year.
In summary, Mavroudis' testimony was offered only to discredit the use of the Norwood property as a sales comparable. It was error for the Tax Court to adopt Mavroudis' "rule of thumb" methodology to value the subject property. The Tax Court's rejection of taxpayer's sales comparison analysis was correct and is affirmed.
Reversed and remanded to the Tax Court for proceedings consistent with this opinion.
NOTES
[1] In Tamburelli, as in our case, both experts adopted a DCF approach despite prior reservations by the Tax Court about this analysis. See University Plaza Realty Corp. v. City of Hackensack, 12 N.J.Tax 354, 368 (Tax 1992), aff'd, 264 N.J.Super. 353, 624 A.2d 1000 (App. Div.), certif. denied, 134 N.J. 481, 634 A.2d 527 (1993).
[2] The indicated values for each municipality were then calculated separately under Chapter l23, N.J.S.A. 54:51A-6, to arrive at the assessments reflected in the Tax Court judgments.