918 A.2d 675 (2007)
391 N.J. Super. 434
HUNTERDON MEDICAL CENTER, Plaintiff-Appellant,
v.
TOWNSHIP OF READINGTON, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued December 19, 2006.
Decided March 28, 2007.
*676 Susan A. Feeney, Newark, argued the cause for appellant (McCarter & English, attorneys; Ms. Feeney, of counsel and on the brief; Daniel P. Zazzali, on the brief).
Martin Allen, Warren, argued the cause for respondent (DiFrancesco, Bateman, Coley, Yospin, Kunzman, Davis & Lehrer, attorneys; Mr. Allen, of counsel and on the brief; Joseph V. Sordillo, on the brief).
Before Judges AXELRAD, R.B. COLEMAN and GILROY.
The opinion of the court was delivered by
AXELRAD, J.T.C. (temporarily assigned).
Hunterdon Medical Center ("HMC"), the operator of a hospital in Flemington, appeals from a judgment of the Tax Court denying exemptions from local property taxation for the 2000 through 2002 tax years for portions of a building it owned in Readington Township. HMC operated a Wellness Center, a Physical Therapy Service ("PT Service") and a Pediatric Practice in the building.[1] The court found that *677 these three activities did not meet the statutory "use" test to qualify for hospital purposes, and the Pediatric Practice further failed to meet the statutory "not-for-profit" requirement, thus disqualifying those portions of the building from exemption under N.J.S.A. 54:4-3.6. At issue in this appeal is the propriety of the Tax Court's articulation and application of a three-component analytical framework to distinguish off-campus facilities qualifying for a "hospital purposes" exemption, and those merely housing health-related activities, which are not exempt. We agree with the criteria developed by the Tax Court and their application to the facts in this case. Therefore, we affirm.

I
The facts adduced during the eight-day trial are set forth at length in Hunterdon Medical Center v. Readington Township, 22 N.J.Tax 302 (2005). The property under appeal is located about nine and one-half miles from the hospital campus, and contains a three-story structure totaling 26,055 square feet. During the years under appeal, the Wellness Center contained a total of 18,546 square feet, with about 16,000 square feet located on the first floor of the building and about 2500 square feet located on the second floor; the PT Service treatment room was located on the second floor of the Wellness Center; and the Pediatric Practice occupied 4584 square feet on the third floor of the building.
The Wellness Center, which was open to the public for a fee, contained facilities and equipment similar to a commercial fitness center or health club. During the years under appeal, its membership was primarily public-based. The Center's director, whose background was in commercial health clubs and not in medically-based fitness programs or facilities, hired all staff, without participation from HMC's human resources department or the Wellness Center's medical director. The Center also offered classes and seminars on topics such as healthy snacks, before and after pregnancy exercise, ballroom dancing and yoga. No member of HMC's physical therapy or cardio-pulmonary rehabilitation staff, dieticians or nutritionists served as instructors. The medical director conducted only a few lectures during the years under appeal.
The medical director was a part-time, independent contractor, who was not obligated to be physically present at the Center. He was able to fulfill his three and one-half hour per week contractual commitment almost exclusively by telephone conversations with the Center's director. No physician had any office or hours at the Center. Although Center members were required to complete a Physical Activity Readiness Questionnaire similar to many commercial fitness centers, those with medical restrictions were neither monitored by the fitness staff nor a physician, and were primarily responsible and accountable to themselves for the guidelines recommended to them by their physicians.
HMC operated one of three off-site PT services in this facility. The PT Service occupied a treatment room on the second floor of the Wellness Center, and the exercise equipment and facilities at the Center were available to persons receiving therapy. Anyone from the general public having *678 an appropriate prescription from a physician could obtain therapy from the PT Service. The staffphysical therapists, rehabilitative aides, and physical therapy aidesconsisted exclusively of non-physicians. There were no physicians on site and no member of the hospital's medical staff reviewed or supervised the therapy provided. Nor was any information communicated to the Wellness Center's medical director concerning therapy provided by the PT Service.
The Pediatric Practice existed as a private practice before its acquisition by HMC in 1997. The space in the building was like any other primary pediatric physician's office; it had examining rooms, physicians' offices, a nurses' station, laboratory, reception and waiting room, and ancillary facilities. The practice had weekday office hours, with after-hours emergency access directed by "911" to a centralized triage facility, which allocated patients among hospitals. Reciprocity of patient referrals between the hospital and the Practice occurred on occasion. The pediatricians were compensated by HMC pursuant to a short and long-term incentive plan similar to the one that had been in place under the prior private ownership, which provided for a specified base salary plus profit sharing.

II
N.J.S.A. 54:4-3.6 provides exemptions from local property tax for "all buildings actually used in the work of associations and corporations organized exclusively for hospital purposes." The three statutory criteria that must be satisfied to qualify for exemption are: (1) the entity owning the property must be organized exclusively for the exempt purpose; (2) the property must be actually used for the exempt purpose; and (3) the operation and use of the property must not be conducted for profit. Paper Mill Playhouse v. Millburn Twp., 95 N.J. 503, 506, 472 A.2d 517 (1984); Hunterdon Med. Ctr., supra, 22 N.J.Tax at 315.
HMC's position was that these facilities and services satisfied the hospital use requirement because they constituted part of the "continuum of care" provided by the hospital, were integral to its mission, and were integrated with its operation. In analyzing HMC's exemption claim, Judge Kuskin traced the case law interpreting the "hospital purposes" exemption of N.J.S.A. 54:4-3.6, beginning with the landmark case of City of Long Branch v. Monmouth Medical Center, 138 N.J.Super. 524, 351 A.2d 756 (App.Div.1976), aff'd o.b., 73 N.J. 179, 373 A.2d 651 (1977). There, we articulated the test to be employed in determining whether hospital-owned facilities were actually used for hospital purposes as "whether the property is `reasonably necessary' for such purposes." Id. at 532, 351 A.2d 756. This standard had its origins in the concept of a hospital as a 24-hour continuous care facility. We concluded there that the apartment building a block and a half from the hospital, which was used exclusively by medical residents, interns and nurses on the hospital staff, was tax-exempt. Our rationale was that the furnishing of housing facilities to hospital staff members at reduced rental "is reasonably necessary for the proper and efficient operation of the hospital," because by providing the housing facilities "in or near the hospital, the Center is better able to function properly and efficiently on a 24-hour basis." Id. at 533, 351 A.2d 756. We denied the exemption for the building that was used for private professional offices, holding "[c]onvenience is not the test." Id. at 535, 351 A.2d 756.
Relying upon Monmouth Medical Center, we held in Perth Amboy General Hospital v. City of Perth Amboy, 176 N.J.Super. *679 307, 422 A.2d 1331 (App.Div.1980), that hospital-owned condominium units located one and a half miles from the hospital and occupied by medical residents and their families were entitled to exemption as being used for a hospital purpose. We commented that "all circumstances considered, the distance separating the condominium from the hospital is not sufficient by itself to deprive the condominium of a `hospital purpose.'" Id. at 311, 422 A.2d 1331.
In City of New Brunswick v. Rutgers Community Health Plan, Inc., 7 N.J.Tax 491, 504 (1985), and Intercare Health Systems, Inc. v. Cedar Grove Township, 11 N.J.Tax 423, 431 (1990), aff'd, 12 N.J.Tax 273 (App.Div.1991), exemptions were denied to an HMO-owned health center and to a nursing home because their operations were not sufficiently "integrated" with affiliated hospitals to support a conclusion that they existed to facilitate the goals and purposes of those hospitals. In so concluding, the Tax Court found the requirement for "continuous ongoing care" to be "implicit within the [dictionary] definition[s] of the word `hospital'" and described "24-hour continuous care" as a "distinguishing feature of a hospital." Rutgers Community Health Plan, supra, 7 N.J.Tax at 500, 504.
In Jersey Shore Medical Center v. Neptune Township, 14 N.J.Tax 49, 68-69 (1994), the Tax Court granted an exemption to an on-site child care center, concluding it was reasonably necessary for the hospital's operation because it existed to further the hospital's staffing needs and the essential function of its 24-hour continuous medical and nursing care operation.
As noted by Judge Kuskin, it became apparent that none of these decisions addressed the evolving healthcare model or the characteristics of the facility presented in the trial before him.
Based on the extensive expert and lay testimony presented, it was clear that hospitals, like HMC, no longer confined themselves to a core function of providing 24-hour continuous acute care. Rather, they now embraced a "continuum of care" concept aimed at enhancing and improving the general health status of the population in the local area, offering a panoply of expanded "wellness" and "lifestyle" services, programs, and management tools provided at the hospital or at other locations, similar to those under appeal. Of concern to the Tax Court was that this elusive model enabled hospitals to self-define their mission, and in doing so, to determine the direction and extent of the definition of "hospital purposes" without limitation. The court cited HMC's expert's broad definition of a "hospital" and "hospital purposes" as an illustration:
HMC's expert defined a hospital as "a site of care that provides, at a minimum[,] 24 hour inpatient care and outpatient programs and services that meet the needs of the population served by that particular entity." He defined a hospital purpose as "any activity or service that furthers the mission of that hospital."
[Hunterdon Med. Ctr., supra, 22 N.J.Tax at 327.]
Judge Kuskin astutely observed that the effort by hospitals to self-define their mission was reminiscent of the following conversation in Lewis Carroll's Through the Looking Glass:
I don't know what you mean by "glory," Alice said.
Humpty Dumpty smiled contemptuously. "Of course you don'ttill I tell you." ... "When I use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to meanneither more nor less."

*680 [Ibid. (citation omitted).]
In an attempt to ascertain the parameters that HMC would draw, the trial court asked HMC's witnesses to distinguish between the Wellness Center and a hypothetical gourmet restaurant owned by HMC in which a hospital nutritionist or dietician was present to give advice as to appropriate menu selections. HMC's witnesses drew the distinction that a restaurant dispensed a "commodity" while the Wellness Center provides "services." They further contended that a restaurant patron would not be a regular diner at the restaurant and would not be bound by the recommendations of the nutritionist or dietician. The court was unconvinced by their explanations.
The gourmet restaurant hypothetical illuminated the open-ended nature of the definition of "hospital purposes" asserted by HMC. It became apparent to the court that the "reasonably necessary" test, as it had been applied in prior cases where hospitals were analyzed in terms of providing the core function of 24-hour continuous acute care, could not be applied to the facts before it, because this would produce an inconclusive result. The court explained the dilemma confronting it as follows:
The expansion of hospitals' definition of their role in health care and the expansion of their health-related activities affect the analysis of a hospital purposes exemption claim under N.J.S.A. 54:4-3.6 in two respects. First, for purposes of that analysis, the definition of a hospital as a 24-hour continuous acute care facility set forth in Rutgers Community Health Plan and Jersey Shore Medical Center, no longer is accurate or adequate. Second, the "reasonably necessary" standard no longer provides a workable basis for determining qualification for the exemption because, under that standard, a hospital can argue, as does HMC, that any off-campus facility used for continuum of care health-related purposes is reasonably necessary to its operations, and a taxing district can argue, as does defendant, that no off-campus facility is reasonably necessary because the hospital can continue to function and provide its core acute care services without the facility.
[Hunterdon Med. Center, supra, 22 N.J.Tax at 329 (citations omitted).]
The Tax Court therefore considered factors given weight in other New Jersey cases and cases from other jurisdictions, and articulated a comprehensive analytical framework for evaluating whether HMC and other hospitals' off-campus facilities are used for hospital purposes to qualify for exemption under N.J.S.A. 54:4-3.6. The framework is comprised of the following three components:
1. [T]he nature and extent of the integration between the hospital and the subject facility. The greater the integration the more likely it is that a facility is serving a hospital purpose. In applying this component, the distance of the facility from the hospital campus must be considered. In Perth Amboy General Hospital . . . the location of the condominium units in issue, one and one-half miles from the hospital, did not preclude exemption. However, distance alone may suggest a lack of integration with the hospital;
2. [T]he extent to which the activity conducted in the facility is under the control or supervision of the hospital medical staff. The lesser the amount of supervision, the more likely it is that the activity is not serving a hospital purpose; and
3. [W]hether the facility serves primarily hospital patients or primarily members of the general public. For purposes *681 of this determination, a person generally should not be deemed a hospital patient merely as a result of using the facility . . . . Under some circumstances, however, a person using a hospital-owned and operated off-campus facility could become a hospital patient by virtue of that use [referencing discussion concerning the CP Rehab Service[2]].

Hunterdon Med. Ctr., supra, 22 N.J.Tax at 332.
The court set forth two additional considerations in applying the third component: (1) the extent to which the facility competes with commercial or privately owned facilities in the area, noting that competition in and of itself did not provide a basis to deny an exemption; and (2) the percentage of use of the specific facility by hospital patients in order to determine whether the facility is "predominantly used" for hospital purposes. Id. at 333.
Applying this framework, the court concluded that the Wellness Center, PT Service and Pediatric Practice did not qualify for the hospital purposes exemption under the second prong of N.J.S.A. 54:4-3.6, setting forth its findings in detail. The Wellness Center did not qualify because there was no integration of the care provided at the hospital with the activities and programs of the Center; there was virtually no supervision of or interaction with its members by the hospital's medical staff; and the vast majority of individuals using the facility were members of the general public, paying a membership fee. The court found the PT Service did not qualify for exemption because it was not integrated medically and received no meaningful supervision by the hospital medical staff, nor did it serve primarily hospital patients referred for continuation of treatment. The court concluded that the Pediatric Practice did not qualify because it primarily served members of the public, not hospital patients, and directly competed with private physician practices in the vicinity.[3]

III
On appeal, HMC contends the trial court erred by replacing the existing "reasonably necessary" standard, which the Wellness Center, PT Service and Pediatric Practice satisfied, with a new "analytical framework" test that is legally flawed. According to HMC, the new test improperly adds two factors beyond the nature and extent of the integration between the hospital and the subject facility: (1) the extent of supervision or control by the hospital medical staff (second component) and (2) whether the facility serves primarily hospital patients or primarily patients of the general public (third component). HMC further contends the third component of the analytical framework is vague as to who is a hospital patient, and is susceptible to being applied inconsistently. Moreover, HMC contends this component should be invalidated because it can be interpreted to *682 lead to illogical and unjust consequences, by requiring these facilities to accept only current patients of the hospital and penalizing hospitals for treating charity care and future patients. HMC also questions the validity of a test that considers the distance from the hospital as an important factor "suggest[ing] a lack of integration" (first component), although it acknowledges the court did not appear to apply this factor here.
Alternatively, HMC argues the challenged facilities meet the analytical framework proposed by the Tax Court and the court misapplied those standards in denying the exemptions. Specifically, HMC contends the court erred in implicitly limiting the definition of "hospital `medical staff'" in the second component involving supervision to hospital-employed "physicians" when it denied the exemption to the PT Service. HMC also contends the court inconsistently applied the third component and made an arbitrary distinction between those who were patients of the hospital for purposes of granting an exemption to the CP Rehab Service and the three departments that were denied exemptions. HMC further challenges the court's finding on the profitability prong of N.J.S.A. 54:4-3.6 regarding the Pediatric Practice.
We consider HMC's arguments in the context of several well established principles. Tax exemptions are not favored as they depart from the fundamental concept that everyone should bear a just and equal share of the public burden of taxation. Princeton Univ. Press v. Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961). Therefore, tax exemption statutes such as N.J.S.A. 54:4-3.6 are strictly construed against those claiming exemption. New Jersey Carpenters Apprentice Training & Educ. Fund v. Borough of Kenilworth, 147 N.J. 171, 189, 685 A.2d 1309 (1996), cert. denied, 520 U.S. 1241, 117 S.Ct. 1845, 137 L.Ed.2d 1048 (1997); Paper Mill, supra, 95 N.J. at 506-507, 472 A.2d 517. The burden is on the claimant to bring itself within the exemption provision and all doubts are to be resolved against the one claiming the exemption. Carpenters Apprentice, supra, 147 N.J. at 178, 685 A.2d 1309; Bloomfield v. Acad. of Med. of New Jersey, 47 N.J. 358, 363, 221 A.2d 15 (1966).
The record clearly demonstrates that the operation and mission of hospitals has evolved beyond the 24-hour continuous acute care facility that served as the basis for the reasonably necessary standard. The "continuum of care" concept now embraced by hospitals enables them to self-define what is "reasonably necessary" to fulfill their mission. In essence, this allows, and potentially encourages, an open-ended definition of hospital purposes, which is contrary to the strict construction of statutory exemptions. Circumstances such as these require a common sense approach and pragmatic application of the law.
The reasonably necessary standard articulated in prior cases may not provide a workable basis for analyzing a hospital's exemption claim for its off-site facility used as part of its continuum of care in its expanded health care role. Therefore, the Tax Court judge, using his "special expertise", Alpine Country Club v. Borough of Demarest, 354 N.J.Super. 387, 390, 807 A.2d 257 (App.Div.2002), formulated a logical, practical and viable standard, which is well-reasoned, supported by case law, and which we expressly endorse. The analytical framework articulated by Judge Kuskin is a natural progression and amplification of the broader and less defined "reasonably necessary" standard for determining whether a facility meets the second prong for exemption under N.J.S.A. 54:4-3.6. By setting forth a more defined formula of *683 standards to utilize in determining what constitutes a hospital purpose, the Tax Court has provided guidance for analyzing off-campus hospital facilities such as those under appeal. Our endorsement of this framework is not an abandonment of the reasonably necessary standard, which should be used in the first instance. Under circumstances such as these, however, where the reasonably necessary test is inconclusive without further articulation of what defines "hospital purposes," the Tax Court should consider and weigh the additional criteria contained in the analytical framework to differentiate between off-campus facilities that serve hospital purposes from those merely housing health-related activities.
The components of the analytical framework contain rational, objective criteria, with a built-in flexibility that enables a fair balancing of the interests of the hospital and the municipality. For example, both the integration and the medical supervision components are phrased in terms of a "sliding scale," i.e., greater integration indicating more likelihood the facility is serving a hospital purpose and less supervision indicating less likelihood the activity is serving a hospital purpose. Additionally, under the third component, although the court noted that mere use of the services or activities does not transform a member of the public into a "hospital patient," it recognized there are circumstances where such person would be considered a "hospital patient," referencing the CP Rehab Service as an example. Other examples of the flexible and even-handed standards contained in this framework are that "distance alone [of the facility from the hospital] may suggest a lack of integration" and that competition with a commercial or privately-owned facility is a consideration but not a disqualifying factor. Hunterdon Med. Ctr., 22 N.J.Tax at 332 (emphasis added).
The third component of the analytical framework is neither vague nor illogical. The court set forth specific factors and standards to utilize when evaluating whether the facility primarily services hospital patients or members of the general public. We do not perceive these standards being interpreted to penalize HMC for treating charity care or future patients.
We are also satisfied the Tax Court consistently and uniformly applied its analytical framework to HMC's hospital purposes exemption claim. We do not read its decision denying the exemption to the PT Services as limiting the required medical supervision component to physicians. This component involves a weighing process; the more supervision by medical staff, the more likely the facility meets this second of the three components. We note that the type of services conducted at PT Services are the least medically intrusive phase of physical therapy.
We recognize the unique role of the Tax Court in determining issues such as those before us, its special expertise and the deference to which its findings are entitled. "`[J]udges presiding in the Tax Court have special expertise; for that reason their findings will not be disturbed unless they are plainly arbitrary or there is a lack of substantial credible evidence to support them.'" Alpine Country Club, supra, 354 N.J.Super. at 390, 807 A.2d 257 (quoting Glenpointe Assoc. v. Twp. of Teaneck, 241 N.J.Super. 37, 46, 574 A.2d 459 (App.Div.), certif. denied, 122 N.J. 391, 585 A.2d 392 (1990)). Our scope of review in a case such as this "is limited to determining whether the findings of fact are supported by substantial credible evidence with due regard to the Tax Court's expertise and ability to judge credibility." First Republic Corp. of Am. v. Borough of E. Newark, 17 N.J.Tax 531, 536-37 (App. *684 Div.1998) (citations omitted), certif. denied, 157 N.J. 647, 725 A.2d 1128 (1999).
Other than HMC's challenge to the Tax Court's utilization of its analytic framework, the balance of HMC's arguments on appeal relate to the court's credibility determinations and the weight of the evidence. The court heard extensive testimony, reviewed numerous documents, evaluated the credibility of the witnesses, applied each of the criteria set forth in N.J.S.A. 54:4-3.6, and set forth detailed factual findings and conclusions in a cogent and comprehensive written opinion. We are not persuaded that any of the factual findings and conclusions challenged by HMC are unsupported by the evidence, and thus discern no basis to disturb or further discuss them. R. 2:11-3(e)(1)(A) and (E).
Affirmed.
NOTES
[1] The Tax Court found the portion of the building used exclusively by the cardio-pulmonary rehabilitation service, i.e., the CP Rehab Service office on the first floor of the Wellness Center, qualified for exemption under N.J.S.A. 54:4-3.6 for each of the tax years under appeal, 2000 through 2002. The parties agreed that the court's decision on the exemption issue would control for the parcel for the 2003 through 2005 tax years, which had been appealed and were pending trial, and stipulated to the assessments for all six years. On August 19, 2005, judgments were entered for all six years.
[2] The court found the CP Rehab Service served primarily hospital patients and qualified for exemption under this component. Its patients were admitted into the program through the admissions office of the hospital and the rehabilitation services were provided by an on-premises registered nurse employed by HMC under a hospital based, physician prescribed and reviewed regimen. The court noted, "[b]ecause of the extensive involvement of the Hospital medical staff in the CP Rehab Service, a person undergoing rehabilitation was, in a very real sense, an outpatient of the Hospital, whether or not he or she had been an inpatient in connection with a heart attack or other cardiac or pulmonary problems." Hunterdon Med. Ctr., supra, 22 N.J.Tax at 340.
[3] As previously stated, the court also found the Pediatric Practice failed to qualify under the third prong of N.J.S.A. 54:4-3.6 because of its profit-making function.