NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

TAX COURT OF NEW JERSEY



**Mala Sundar**
 **JUDGE**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625
Telephone (609) 815-2922
TeleFax:   (609) 376-3018
taxcourttrenton2@judiciary.state.nj.us

January 10, 2020

Pablo Kim, Esq.
Irwin & Heinze, P.A.
Attorneys for Plaintiff

Frederick Raffetto, Esq.
Ansell Grimm & Aaron, P.C.
Attorneys for Defendant

> Re:    9 Plaza Court, LLC % Madison Realty v. City of Long Branch
> Block 60, Lot 6
> Docket Nos. 013592-2016; 000085-2018; 000087-2019

Dear Counsel:

This is the court's opinion following trial in the above-captioned matters.  9 Plaza Court, LLC ("Plaintiff"), contests the local property tax assessments on the above-captioned property ("Subject"), a single-family residence located in defendant, City of Long Branch ("City"), for tax years 2017-2019.  The assessments were as follows:

| Tax Year | Assessment | Land Allocation | Improvement Allocation |
|----------|------------|------------------|-------------------------|
| 2017 | $5,309,600 | $3,421,800 | $1,887,800 |
| 2018 | $5,346,200 | $3,421,800 | $1,924,400 |
| 2019 | $5,439,800 | $3,441,800 | $1,997,500 |

The parties stipulated to the expertise of their respective real property appraisers, who were accepted as experts by the court.  Each appraiser opined the true value of the Subject as follows:

| Tax Year | Plaintiff's Appraiser | City's Appraiser |
|----------|------------------------|-------------------|
| 2017 | $4,225,000 | $  9,940,000 |
| 2018 | $3,215,000 | $10,660,000 |
| 2019 | $3,750,000 | $10,840,000 |

*

The main differences between the appraisers were their valuation methodologies and their definitions of the competitive market. Plaintiff's appraiser defined the competitive market as including the neighboring Boroughs of Monmouth Beach and Sea Bright, and the West End section of the City, in addition to the Elberon section of the City where the Subject is located. He relied exclusively on the sales comparison (or market) approach to value the Subject. The City's appraiser, on the other hand, limited the competitive market to the Elberon section of the City and the neighboring Boroughs of Deal and Allenhurst. The City's appraiser used the cost approach to value the Subject and used the market approach only to support those value conclusions (the City having filed counterclaims for each tax year).

For the reasons stated below, the court does not find Plaintiff's appraiser's opinion of the Subject's competitive market persuasive. Thus, and since ten of this twelve comparables were located outside of the competitive market, his value conclusions based on the adjusted sales prices of those comparables are not persuasive evidence of the Subject's true value. The other two comparables while located in the City are also not credible indicators of the Subject's value: one was a condominium unit, and thus not comparable. The other was an oceanfront lot improved by a single-family home, however, it was not usable as the appraiser's adjustments to the property's sales price were not credible.

The City's appraiser's use of the cost approach is justifiable. However, his value conclusions therefrom are problematic because of deficiencies in computing the replacement cost of the improvements. Specifically, the court does not have information as to the source of the estimated costs relied upon by the appraiser, nor information whether the estimate included all appropriate soft costs. Further, the City's appraiser's use of "national update cost multipliers" to trend the 2010 and 2015 estimated construction costs for the Subject to the assessment dates herein

2

is inappropriate. Therefore, the City's appraiser's value conclusions under the cost approach fail, consequently, the court must affirm the assessments for all tax years.

**FACTS**

The Subject's lot is an oceanfront site located in the Elberon section of the City, and, as stipulated to by the parties, measures 19,562 square feet (SF). It is in the R-1 zone which permits single-family residences. The lot abuts the beach. One side faces the Atlantic Ocean (the "ocean frontage") and measures about 120 feet. There is also a bulkhead which does not obstruct the view of the Atlantic Ocean, or access to the beach, from the Subject. The lot is improved by a three-story house with a stipulated-to gross living area (GLA) of 5,136 SF.

Plaintiff purchased the Subject as vacant land in April 2006 for $4,300,000. In May 2010, Plaintiff obtained a construction loan from a bank of $3,916,056 to build a single-family residence on the lot. According to the City's appraiser's report, the original projected cost for building the home was $3,676,987, which comprised the builder's construction contract costs of $2,161,487, plus owner-supplied items of $915,000, and $600,000 custom wind-resistant windows. There was also an independent cost estimate of $3,128,760 provided by the engineering firm overseeing the project for the bank. The City's appraiser stated that the difference in the cost estimates was "attributed by the engineers to the premium and customer crafted finishes not revealed in the plans and available labor forces and rates."

The home was completed in 2012 but damaged by Superstorm Sandy in October of that year. Thereafter, Plaintiff entered into a contract on August 29, 2014, with Monmouth Custom Builders, Inc., a New Jersey-based contractor with a business address in Deal, to "raise, reconstruct and complete" the house. Plaintiff agreed to pay the contractor $1,880,000 for the work. To raise the house, Plaintiff obtained several variances (for building height, number of stories, and ground

3

floor living area). Per the construction contract, Plaintiff was responsible for supplying and installing several items, including supplying all stone; supplying and installing all windows, doors, screens, and hardware; and supplying all bathroom fixtures. Plaintiff was also responsible for the closets and the kitchen (such as pocket doors, ceiling, veneer, cabinets, granite countertops, and appliances). Per the City's appraiser's report, the estimated project cost "of the contractor and owner was $2,837,000 while the engineers estimate was $2,892,129."

The house was completed in August 2015 and reconfigured so that the living areas on the first and second floors were raised. Constructed below the reconfigured first floor was an open-air design "ground floor." The new ground floor consists of a patio and two mechanical rooms, which house a washer and dryer, hot-water heaters, elevator controls, electrical service, and one bathroom. A custom bronze staircase with walnut wood treads leads to the first floor, which has a bedroom, 1½ baths, a kitchen, a den, a pool den, a dining room, and a rear balcony. The second floor has five bedrooms, four full baths, and a rear balcony accessible from the three bedrooms in the rear. Amenities include an in-ground pool and hot tub, an elevator that stops on the ground and first floors, and an oversized, one-car garage. The house is well-maintained.

## VALUATION

*Highest and Best Use*

The court agrees with both appraisers' opinion that the Subject's highest and best use as vacant, and as improved, was for the development of, and use as, a single-family residence.

*Plaintiff's Appraiser's Valuation Conclusion*

Plaintiff's appraiser relied on the sales comparison approach. Although he conceded that the market to which the Subject belongs is limited, he stated that there were sufficient number of sales in neighboring towns which were also proximate to the ocean, to derive a value conclusion

4

therefrom. Of the twelve sales Plaintiff's appraiser included in his report, one was in Elberon, one in the West End of the City, and the remaining ten were in the neighboring Boroughs of Sea Bright and Monmouth Beach. Plaintiff's appraiser acknowledged that there are some differences between Elberon on the one hand, and Sea Bright and Monmouth Beach on the other, demographics being different, and the latter two taxing districts having less "upper echelon" properties than Elberon. He nonetheless found that oceanfront or "partial oceanfront" properties in Sea Bright, Monmouth Beach, and the West End section of the City are part of the same competitive market as the Subject because, in his opinion, a buyer looking for oceanfront properties would consider all these locations as equal alternatives. His comparable sales were as follows:

*Tax Year 2017*

| | Address | Sale Date | List Price | Sales Price | Lot Size (SF) | GLA (SF) | Age |
|---|---|---|---|---|---|---|---|
| 1 | 15 Tradewinds Ln, Sea Bright | 03/15/16 | $3,195,000 | $2,650,000 | 13,050 | 3,978 | 13 |
| 2 | 41 Riviera Dr, Long Branch | 10/23/15 | $5,350,000 | $4,475,000 | N/A - Condo | 4,010 | 18 |
| 3 | 90 Ocean Ave, Monmouth Bch | 06/23/15 | $2,500,000 | $2,400,000 | 29,250 | 6,965 | 114 |
| 4 | 3 Ocean Ct, Long Branch | 06/18/15 | $2,999,999 | $2,700,000 | 8,640 | 2,459 | 95 |
| 5 | 602 Ocean Ave, Sea Bright | 12/18/14 | $1,795,000 | $1,625,000 | 7,500 | 3,716 | 12 |
| 6 | 560 Ocean Ave, Sea Bright | 10/01/14 | $1,199,000 | $1,130,000 | 8,750 | 3,106 | 77 |

*Tax Year 2018*

| | Address | Sale Date | List Price | Sales Price | Lot Size (SF) | GLA (SF) | Age |
|---|---|---|---|---|---|---|---|
| 7 | 23 Tradewinds Ln, Sea Bright | 09/24/17 | $2,999,000 | $2,700,000 | 13,425 | 3,765 | 14 |
| 8 | 152 Ocean Ave, Monmouth Bch | 07/25/17 | $1,699,900 | $1,535,000 | 12,960 | 3,659 | 29 |
| 9 | 7 Marius Ln, Sea Bright | 06/14/17 | $2,799,000 | $2,799,000 | 33,294 | 3,400 | 2 |

*Tax Year 2019*

| | Address | Sale Date | List Price | Sales Price | Lot Size (SF) | GLA (SF) | Age |
|---|---|---|---|---|---|---|---|
| 10 | 534 Ocean Ave, Sea Bright | 09/11/18 | $1,695,000 | $1,597,500 | 7,000 | 3,406 | 12 |
| 11 | 522 Ocean Ave, Sea Bright | 02/20/18 | $1,790,000 | $1,550,000 | 5,250 | 3,307 | 2 |
| 12 | 5 Ocean Ave, Monmouth Bch | 10/20/17 | $3,650,000 | $3,275,000 | 11,440 | 4,664 | 99 |

Plaintiff's appraiser adjusted the sales at the same rate for certain physical characteristics. For lot size differences, he used $2 per square foot (PSF), which he opined was "nominal."[1] Since Sale 2 was a condominium unit, did not provide it with any site size adjustment.

For GLA differences, he used $160 PSF. This was 40% of $400, the average PSF sales prices of 60 waterfront listings in the City, Sea Bright, and Monmouth Beach, that closed between October 1, 2015, and October 1, 2018. He used 40% because this was the average allocation between land and improvement of the assessments of his twelve comparables. His report noted that the base cost for a single-family residential dwelling (Class-C, Type-Very Good) in the Marshall and Swift ("M&S") Valuation Manual is $161 PSF, and thus, his adjustment rate for GLA differences was reasonable.

He provided a location adjustment if a sale had a "partial oceanfront" location, meaning that the property is to the west of Ocean Avenue at +10% of the sale price (properties west of Ocean Avenue are separated from the beach by this road). However, for Sale 3, the price was adjusted upward only 5%.

Another adjustment he provided was for "site views/appeal," to account for ocean frontage and ocean view as compared to the Subject. The rate was 10% of the sale price (upward if "good-/good" for Sales1, 4-6, 10-12, or downward if "good+/good" for Sale 3). For Sales 8 and 9, however, he provided +5% although in his opinion the view/appeal was "good-/good" because, he testified, these properties had lesser ocean frontage, thus, lesser ocean views. He conceded that there is a 17-foot sea wall between the beach and several of his comparables (which was also evidenced by photographs provided by the City, whose appraiser testified that the sea walls in Sea

---

[1] Although the parties stipulated that the Subject's lot size is 19,562 SF, Plaintiff's appraiser used 24,147 SF in his report for size adjustments.

6

Bright and Monmouth Beach are about 17 feet tall); however, he maintained, the flood protection function of the sea wall counteracted any loss of value from its blocking views of the ocean.

Differences in amenities were based on M&S cost data with added "reasonable adjustments." In general, Plaintiff's appraiser used half the M&S cost since in his opinion, the full cost of amenities would not be reflected in the sales price of the home, i.e., cost does not equate to market value. For example, while he valued the Subject's pool at $25,000 for purposes of adjustments, he testified that it would cost more than this to construct. However, potential buyers may not want a pool, so attributing $25,000 as the value of this amenity would be inappropriate (in other words, cost is not value). He also adjusted for condition at 10% (upward if the comparable was in an inferior condition as compared to the Subject, and downward if superior).

For tax year 2017, Plaintiff's appraiser placed most weight on Sales 2 and 4 due to their location in the City, and concluded the Subject's value as $4,225,000. Sale 2 as noted above is a condominium unit. Sale 4 is an oceanfront home in Elberon for which he made a +10% adjustment since, in his opinion, the house's condition was inferior as compared to the Subject.

For tax year 2018, he placed most weight on Sales 7 and 9, due to similarity in location to the Subject, both sales 7 and 9 being east of Ocean Avenue (whereas Sale 8 is west of Ocean Avenue). He concluded the Subject's value at $3,215,000.

For tax year 2019, he placed most weight on Sale 12 due to similarity in location to the Subject, i.e., east of Ocean Avenue (whereas Sales 10 and 11 are west of Ocean Avenue). He concluded the Subject's value as $3,750,000.

Plaintiff's appraiser rejected the cost approach on grounds that cost does not equate to market value. He opined that in the case of high-end, custom houses like the Subject, owners install items that are particular to their tastes, and the cost of those items may not translate into a

7

proportional increase in the market value of the property. He also opined that the Subject was not unique so as to justify using a cost approach even if it was located in the desirable Elberon section of the City, and in a close-knit neighborhood with several walk-to religious institutions. He stated that the market for the Subject was not restricted to buyers who desire to reside near the same walk-to religious institutions and the same close-knit communities.

*City's Appraiser's Valuation Conclusion*

The City's appraiser was adamant that the competitive market for the Subject is limited to Elberon, and the neighboring Boroughs of Deal and Allenhurst. Having worked in these areas for over ten years, he asserted that oceanfront homes in the latter two coastal communities are, like the Subject, on the east side of Ocean Avenue, greatly desirable due to ocean proximity, and their purely residential neighborhood with high-end residences. Additionally, he stated, the defining characteristic of these three communities is that they are tight-knit. Many of the residents belong to the Syrian Jewish community, who reside in Brooklyn but own and use their residences in Elberon, Deal and Allenhurst, as summer homes to entertain friends and family who also spend their summers in the same area. Several Orthodox Jewish synagogues in these communities serve as places of worship and are in close proximity to the residences. The City's appraiser asserted that these residents would not look outside of Elberon, Deal, or Allenhurst for oceanfront homes. Rather, they are interested in high-end homes exclusively in these communities so that they can be in proximity to their friends and family. These buyers, he stated, would not discount custom features in a residence when purchasing the same. They are also, per the appraiser, sophisticated/knowledgeable in real estate, several being in the real estate business. Thus, he opined, there is a competitive market (supply and demand with knowledgeable buyers and sellers) in Elberon, Deal, and Allenhurst, except that most sales are conducted privately because they are

8

between community residents, or their friends and family. Further, he stated, there is very little commercial development, such as hotels or restaurants, in Elberon to attract people without a connection to the area. Ocean front sites, he stated, can be modestly sized (smaller lots at the end of a street of single-family homes, with a pool) or estate- sized (large lots with custom built homes in excess of 8,000 SF), with multiple accessory buildings and amenities such as tennis courts, basketball courts, in-ground pools, cabanas, and spas.

The City's appraiser primarily used the cost approach to value the Subject although he conceded that it was not a unique, one-of-a-kind residence, and that there are other high-end custom- built homes in Elberon. He found the cost approach appropriate for several reasons. One was a lack of comparable sales in the competitive market. Another was the recent renovation to a portion of the Subject in 2015, proximate to the tax years at issue here. As the Subject house was just five years old, it would not require application of a significantly high depreciation rate. More importantly, he stated, there was reliable land sale information, as well as documented cost information relative to the Subject's construction, which were actual cost estimates from the contractor and the engineering firm that monitored the construction for the lender. He also testified that Elberon and Deal have recently been experiencing a high amount of construction of high-end, oceanfront, single-family residences. The cost of constructing a home like the Subject could thus be a relevant consideration for a hypothetical buyer, i.e., a hypothetical buyer could be comparing the sales price for the Subject with the cost of constructing an oceanfront home like the Subject.

He opined that the sales approach was not reliable because of the lack of sales of recently constructed, oceanfront, single-family residences in his defined competitive market, and because it would be difficult to quantify adjustments to the sales prices of sales from non-competitive areas. The only available oceanfront sales in Deal and Allenhurst had older homes, and larger lots

9

extending from Ocean Avenue to the Atlantic Ocean. Further complicating the market approach, the City's appraiser testified, is that only about 3% of all sales in Elberon are listed on Multiple Listing Services (MLS).

Under the cost approach, the City's appraiser's methodology was to initially arrive at a value for land using a market approach and add the same to the depreciated replacement cost of the improvements using the actual estimated costs of construction but trending them forward using "national update cost multipliers." In valuing the land, he used vacant land sales of oceanfront properties in Deal and Elberon that occurred between 2011 and 2019. To him, these sales offered the same utility as the Subject in that they are all on the ends of streets, not estate-sized, and have enough space for a custom, oceanfront residence with an in-ground pool. Further, since his competitive market was Elberon, Deal and Allenhurst, he expanded the timeline search rather than using more current land sales outside the competitive market. His comparables were as follows:

|   | Address | Date | Size (SF) | Price |
|---|---|---|---|---|
| 1 | 6 Adams St, Elberon | 12/14/11 | 38,400 | $5,000,000 |
| 2 | 12 Pullman Ave, Elberon | 06/01/14 | 24,800 | $13,000,000[2] |
| 3 | 9 Wallace Rd, Deal | 04/05/16 | 52,500 | $10,000,000 |
| 4 | 5 Clem Conover Rd, Deal | 02/28/19 | 61,950 | $10,000,000 |
| 5 | 2 Neptune Ave, Deal | 01/10/18 | 34,725 | $11,800,000 |
| 6 | 10 Plaza Ct, Elberon | 11/03/11 | 34,000 | $5,350,000 |

The City's appraiser adjusted these land sales for time, location, size, and utility at the same rate. However, adjustments for time (market conditions) differed for each tax year. He opined that the market appreciated from 2011 to 2019, and more so in 2018 and 2019 due to appreciation of all asset classes following the 2016 national election. The adjustment rates were 10% to 35%.

He adjusted the Deal sales downward 15% for their superior location. This adjustment, explained in detail in the report, is based on Deal's local property tax rate being significantly lower

---

[2] Although his report noted the sale price as $4,600,000, he testified that it should be $13,000,000.

than the City's.[3] Sale 5 was adjusted downward an additional 10% for superior location because the City's appraiser found it to be in a neighborhood of some of the nicest homes in Deal. He also adjusted negatively for lot size differences using his judgment. He noted that although the comparable sites were all larger than the Subject, this did not destroy comparability. Rather, it only meant that a larger site can have a residence with a larger footprint. He also adjusted Sale 2 upward 20% because part of the site is on a slope/cliff, restricting construction. His adjusted land value conclusion was $6,000,000 for tax year 2017 and $6,600,000 for tax years 2018 and 2019.

In estimating the replacement cost new of the improvements, the City's appraiser relied on the actual cost construction estimates for the Subject. He opined that the cost data in M&S was unreliable since it does not provide accurate estimates for luxury homes (it being difficult to account for specialized and luxury construction features in the subject such as the $600,000 wind-resistant windows; imported, expensive stone for the exterior; and the bronze stairway).

With respect to the 2010 cost estimates to construct the house, the City's appraiser had two sets to choose from: (1) the original projected cost of $3,676,987 (under the construction contract with the builder of $2,161,487, plus owner-supplied items of $915,000 and the $600,000 windows); and (2) a cost estimate of $3,128,760 provided by the engineering firm overseeing the project for the lender bank. He chose the latter as the best indicator of the replacement cost of the house as originally designed because they were specific to the Subject, and since some of the "specialized items" not included in the engineering firm's estimate would not be "fully compensable in the market."

---

[3] For instance, he noted, an assessment of $10 million would result in a tax of $206,100 in the City versus $69,700 in Deal due to the tax rates being 2.061% and 0.697% respectively. The difference of $136,400 in taxes, if capitalized at 7% would reflect a value difference of about $1,950,000, or a net of $1,300,000, due to the federal income tax deduction available for property taxes (such tax benefit being severely curtailed for tax year 2018 onwards due to federal legislation).

As to the cost to repair/renovate the house following Superstorm Sandy, the appraiser isolated costs that represented additions/improvements, such as house raising, additional pilings, masonry for the foundation, steel columns to hold up the house and balconies, framing for the ground, first floor, new overhang, and elevator, exterior stairs and rails from the ground floor to the first floor, and the elevator, for a total of $576,553. These items (and respective costs) were selected from the "Proposal, Final Specification 6.26.14" appended to the August 29, 2014 contract between Plaintiff and Monmouth Custom Builders, Inc., included in the appraiser's report. He then trended these costs forward using "national update cost multipliers" as follows:[4]

|  | 2016 | 2017 | 2018 |
|---|---|---|---|
| (a) 2010 Improvement Cost | $3,128,760 | $3,128,760 | $3,128,760 |
| (b) Multiplier | 112.97% | 116.40% | 121.47% |
| (c) Updated Cost (a) x (b) | $3,534,561 | $3,641,979 | $3,800,548 |
| (d) 2012 Renovation Cost | $576,553 | $576,553 | $576,553 |
| (e) Multiplier | 106.53% | 109.76% | 114.54% |
| (f) Updated Cost (d) x (e) | $614,180 | $632,845 | $660,399 |
| Total Replacement Cost New (c) + (f) | $4,148,741 | $4,274,824 | $4,460,947 |
| PSF | $745 | $767 | $801 |

The City's appraiser chose not to add entrepreneurial profit to these cost estimates for two reasons: One, a lack of newly constructed, single-family residence sales in the market to determine the proper entrepreneurial profit for the Subject, and two, the engineering firm noted that "the overhead and profit, general conditions and contingency factors" were built into the cost proposals.

As for depreciation, the City's appraiser found the Subject improvement effectively new as of the valuation dates and found no functional or external obsolescence; however, he reduced

---

[4] The table is an exact representation of the figures provided in the City's appraiser's report. It appears that the years in the columns represent the assessment dates of 10/1/2016; 10/1/2017; and 10/1/2018. It also appears that the appraiser multiplied the actual costs by multipliers with more digits than shown. For example, for the assessment date of 10/1/2017, the improvement cost multiplied by the as-shown multiplier of 1.164 should result in $3,641,877. The actual multiplier used is closer to 1.16403 since the result is shown as $2,641,979.

12

the replacement cost by 5% for estimated loss in value due to physical deterioration. These provided a depreciated improvement value of $3,940,998, $4,061,004, and $4.237,900, for each tax year 2017-2019. With land values added to these amounts, he concluded the Subject's value at $9,940,000, $10,660,000, and $10,840,000, for each tax year 2017-2019.

The City's appraiser concluded that the market approach was not reliable due to the absence of sales of oceanfront newly constructed, single-family homes in the competitive market for the Elberon section. Nonetheless, he noted, his value conclusions under the cost approach were supported by the unadjusted sale prices of the following oceanfront properties:

|   | Address | Sale Date | Sales Price | Lot Size (SF) | GLA (SF) |
|---|---------|-----------|-------------|---------------|----------|
| 1 | 1155 Ocean Ave, Long Branch | 12/12/16 | $13,500,000 | 81,000 | 3,916 |
| 2 | 1235 Ocean Ave, Long Branch | 05/19/15 | $14,000,000 | 91,911 | 5,100 |
| 3 | 2 Beringer Rd, Deal | 10/03/17 | $14,200,000 | 66,599 | 7,268 |
| 4 | 9 Monmouth Terr., Deal | 12/21/17 | $9,000,000 | 17,250 | 5,480 |
| 5 | 1 Monmouth Dr., Deal | 03/28/18 | $19,698,742 | 60,984 | 6,685 |

He noted that Sale 4 which was most similar to the Subject in terms of lot size and GLA, which while superior (being in Deal), and also inferior (condition, age, quality of construction, and utility as the lot is elevated from the beach and no in-ground pool), still commanded a sales price of $9 million. He conceded that the lot sizes of the other comparables were significantly larger, however, noted that the residences were inferior as compared to the Subject's. He observed that the unadjusted sale prices of the five comparables indicated a value range for the Subject of $9,000,000 to $11,500,000, which supported his value conclusion under the cost approach.

**ANALYSIS**

A complainant carries a dual burden: first of overcoming an assessment's presumptive correctness, and thereafter, of persuading the court what the correct value of the property should be. MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373, 377 (Tax 1998); Ford Motor Co. v. Township of Edison, 127 N.J. 290, 314-15 (1992), aff'g, 10 N.J.

13

Tax 153 (Tax 1998). If the court finds that a plaintiff has failed to overcome the presumptive correctness of the assessment, and the taxing district makes no claim for assessment adjustment (either as a counterclaim or through evidence), the court can affirm the assessment. MSGW, supra, 18 N.J. Tax at 378-79. "[A]n appraiser should fully document his opinion"; thus, an appraiser's opinion that is "unsubstantiated" merits no attention. Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 280 (1985); see also MSGW, supra, 18 N.J. Tax at 376 ("Plaintiff must present evidence sufficient to demonstrate that the appeal is based on sound theory and objective data rather than on mere wishful thinking").

The court finds that both Plaintiff and the City have respectively overcome the presumptive correctness of the assessments by providing evidence from appraisers who used acceptable valuation methods to provide value conclusions. The court will therefore examine all evidence before it to determine which is more persuasive.

*Plaintiff's Appraiser's Value Conclusions*

All of Plaintiff's appraiser's comparable sales were "usable" in that they were arms-length, and proximate to the assessment dates. Nonetheless, the court is unpersuaded by Plaintiff's appraiser's opinion that Sea Bright, Monmouth Beach, and the City's West End section are a competitive market to the Subject. His explanation that a potential buyer of an oceanfront property would consider properties in these areas, in addition to considering the Subject in Elberon did not account for or refute the tight-knit community aspect of Elberon, the lack of any commercial development therein, or the undisputed fact that very few properties in this section of the City are listed on the MLS, a service utilized by a majority of home buyers when searching for homes listed for sale. As explained in detail by the City's appraiser, the choice of Elberon for an oceanfront home is driven by several specific community-based reasons. The City's appraiser demonstrated

14

a high degree of knowledge and experience about the market in Elberon, Deal and Allenhurst (and had appraised his land comparable 6 for purposes independent of this litigation), thus, his decision to limit the competitive market to these coastal communities for purposes of valuation, is more compelling.

Consequently, the court cannot find that Plaintiff's appraiser's comparable sales are credible indicators of the Subject value. This is so even if the court were to analyze the two sales he used, both being in the City, and to which Plaintiff's appraiser placed "all weight" for purposes of determining the Subject's value for tax year 2017. One is Sale 2. This property is a condominium unit which makes it simply not comparable to the Subject. It does not become comparable just because the appraiser made an upward adjustment of $48,294 for "site size." Even that adjustment computation is questionable because he multiplied the Subject's site size (listed as 24,147 SF although stipulated to be lower, see supra n.1) by $2 PSF, which amount, as noted below, is not credible. Further, as the City correctly points out, a condominium owner's rights are subject to the homeowner's association bylaws whereas the Subject has no such restrictions as to use. Additionally, Sale 2 is located in a commercially developed area with restaurants and shops across the street from the condominium. Plaintiff's appraiser's justification that the lack of location adjustment is because the condo is in a gated community is unpersuasive. Therefore, a potential buyer of Sale 2 would not buy a home such as the Subject, rendering Sale 2 not truly comparable to the Subject.

The other is Sale 4. An oceanfront property, which sold June 18, 2015, thus closer to tax year 2017, it is nonetheless problematic as a comparable due to its lot size (8,640 SF) and GLA (2,459 SF) being considerably smaller than the Subject. In this connection, Plaintiff's appraiser's $2 PSF adjustment for lot size is not credible. First, there was no proffer of an objective basis for

15

the same. Second, the unadjusted price of the City's vacant land Sale 2 (12 Pullman Avenue), which sold a year earlier for $4,600,000 for a 24,800 SF lot does not Support the $2 PSF adjustment for lot size. Similarly, an adjustment of $160 PSF for GLA is problematic because Plaintiff's appraiser admitted that of the 60 listings he used in his GLA adjustment methodology came from the MLS whereas most Elberon properties are not listed on MLS, and the "waterfront listings" he used could include riverfront properties in addition to oceanfront properties. Although the appraiser's conclusion was reasonably buttressed by M&S cost data as of August 2018 ($161 PSF for Class C residential single-family homes with "Very Good" type), there is no information as to whether: (a) the Subject is a Class C property; or (b) this cost included direct and indirect costs, adjustments for building height, and the like.

Further, Plaintiff's appraiser's discounting the effect of a 17-foot sea wall between several comparables and the ocean is problematic. The photographs show the sea wall to be of significant height, and show a road separating the sea wall and several comparables. Although he provided upward adjustments claiming that the 10% factors in the sea wall's safety feature, it is difficult to agree that the +10% adjustment adequately compensates for the lack of unobstructed ocean views and immediate access to the ocean present in the Subject.

Another issue was his discounting the chronological age of four comparables that were over 25 years older than the Subject. The addenda in the report included a sheet from M&S Valuation Manual (December 2018) titled "Total Economic Life Table" and subtitled "Life Expectancy Guidelines – Typical Building Lives," which included data as to "single family historical residences," "Town and Row houses, "Tropical houses" and "Yurts."[5] It is unclear how this sheet helps since it is unknown how or whether any of his comparables (or even the Subject)

_____

[5] The information on the remainder of the sheet pertained to "stores and commercial buildings."

fell within these categories. Even if the comparables were deemed "Tropical" because shore homes may be considered as summer homes, the data sheet does not assist the court. The sheet deemed such houses as Class C, with conditions as either "good," "average," and "low cost" for which the ages were noted as 55, 50 and 45 years. It is unknown whether the Subject or the comparables were Class C. It is unclear how the data's 55, 50, or 45 years rendered them comparable to the Subject's age of five years. The conclusion that the comparables' effective age was much lesser is also problematic because Plaintiff's appraiser's inspection of the same was limited to exterior, drive-by views per his report, and there were no documents to evidence renovations or extensive upgrades to these comparables.

Further, Sale 1 had an easement in favor of the State and the Borough of Sea Bright (for $1 consideration) recorded on 05/23/2017. There was no discussion whether this easement would merit an upward adjustment (presuming the easement burdened the property). Although Plaintiff's appraiser stated that all weight was placed on Sales 2 and 4 for tax year 2016, having nonetheless included Sale 1 as a comparable, all aspects that can impact an adjustment to its sales price (and thus, can influence the determination of the Subject's value), should be addressed. Even if the aspect or factor is opined as being insignificant with minimal impact on the value conclusion, this opinion should still be addressed.

In sum, the court finds that none of Plaintiff's appraiser's comparable sales were (1) in the competitive market, and (2) comparable to the Subject. Therefore, the court cannot rely on Plaintiff's appraiser's value conclusions for the Subject.

*City's Appraiser's Value Conclusions*

Plaintiff is correct that normally the cost approach is an appropriate methodology to value unique or special-purpose properties. See Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445,

17

452 (Tax 1980) ("[t]he cost approach is normally relied upon to value special purpose or unique structures for which there is no market."). It is further undisputed that the Subject is not a special-purpose property as that phrase has been understood. See generally TD Bank v. City of Hackensack, 28 N.J. Tax 363, 379-80 (Tax 2015) ("Special purpose properties are often limited-market properties which have few potential buyers at a given time due to their specialized use, and often include manufacturing plants, railroad sidings, research and development properties, museums, schools, houses of worship, theaters, and sports arenas . . . or a highly-specialized production facility like a brewery") (citations and internal quotation marks omitted). The City's appraiser also conceded that the Subject's home is not unique in that there are other high-end contemporary custom-built homes in Elberon, and that there is a market with supply and demand in Elberon, albeit a mostly private one. Thus, Plaintiff is correct that the sales comparison approach would the a more appropriate method of valuing a single-family residence.

The City's appraiser's rejection of the sales approach was justified by the lack of comparable, newly-constructed, oceanfront properties in the competitive market. However, the Subject's house was constructed in 2010, thus is not "new" vis-à-vis the tax years at issue here (2017-2019). Although the house was renovated in 2014/2015 to raise the house and reconfigure the living areas, a major portion of the 2010 construction remained. Additionally, the appraiser was able to identify five sales in the competitive area, whose sales dates are more proximate to the assessment dates herein. While only one was on the MLS, he was able to verify the details of the other four sales. Further, his identified characteristics requiring adjustment was minimal, namely, site size (four of the five sales had lot sizes almost three-to-four times larger than the Subject), location, and condition of the residences (all of which were less than 40 years old). It would thus

18

appear that the sales comparison approach may have been a more reasonable method to value the Subject.

Nonetheless, there were other factors that reasonably point to the unreliability of using only a sales approach. Almost all these sales were private (Sale 1 being recorded for a nominal consideration however, the actual consideration was $13,500,000 per the brother of the seller), thus, they were not exposed to the market. Sale 2 was sold in 2015 but was substantially renovated thereafter; thus, its sales price would not be a reliable indicator. Sale 3 was knocked down after its sale on October 3, 2017 to make way for a large residence and is yet to be completed, thus, would be treated effectively as a land sale. Sale 5 was at the high-end, thus, an outlier. This left only Sale 4, and one sale is generally not considered to be a sufficient sampling to conclude a reliable value under the market approach. See generally Lorenc v. Township of Bernards Township, 5 N.J. Tax 39, 49 (Tax 1982).

Additionally, the City's appraiser's credible (and undisputed testimony) that due to the increased construction of custom, oceanfront residences in the competitive market, potential buyers of the Subject could reasonably compare its sales price with the cost of constructing their own custom, oceanfront residence, also supports the use of the cost approach.[6] Nor would they discount custom features when negotiating the sale prices. See also The Appraisal of Real Estate at 566 ("The cost approach is particularly important when a lack of market activity limits the usefulness of the sales comparison approach . . . . Because cost and market value are usually more

---

[6] This is the "principle of substitution [which] is basic to the cost approach." See The Appraisal Institute, The Appraisal of Real Estate 563 (14th ed. 2013). "This principle affirms that a knowledgeable buyer would pay no more for a property than the cost to acquire a similar site and construct improvements of equivalent desirability and utility without undue delay." Id. at 563-64.

19

closely related when properties are new, the cost approach is important in estimating the market value of new or relatively new construction.").

The above reasons plausibly justify the City's appraiser's decision to primarily rely on the cost approach. An expert is not wedded to any one specific valuation method. See Genola Ventures-Shrewsbury v. Borough of Shrewsbury, 2 N.J. Tax 541, 551 (Tax 1981) ("there is no single doctrinaire approach to valuation of real property"). Thus, "[a]n expert is not limited to the traditional approaches to value if his knowledge and experience, adequately supported, can be of assistance in regard to the critical issue of that price which hypothetical parties will use as an exchange for real property on the assessment date." Id. at 551-52. See also Pennwalt Corp. v. Township of Holmdel, 4 N.J. Tax 51, 61 (Tax 1982) ("[t]he decision as to which valuation approach should predominate depends upon the facts of the particular matter and the reaction to these facts by the experts") (citation omitted). Thus, while the cost approach is *generally* inappropriate for valuing a single-family residence, it may nonetheless be used if justifiable circumstances so warrant.

However, there are problems with the City's appraiser's application of the cost approach to estimate the replacement cost of the improvement on the Subject. One is that the court was not provided with, nor does his report include, the details of the 2010 cost estimates of the engineering firm retained by the lender which the appraiser used and relied upon to develop his replacement cost. Nor does the court does know the source of these cost estimates, i.e., whether they were based on a cost data service such as M&S or RSMeans[7] which normally include national as opposed to local costs; or whether the costs were local, and if so, what was the source.

---

[7] The "most recognized" cost-estimating services which "publish data for estimating the current cost of improvements" are M&S, RSMeans and McGraw-Hill Construction Dodge. The Appraisal of Real Estate at 582.

Also unknown is whether such an estimate included indirect or soft costs. Soft costs are "expenditures or allowances that are necessary for construction but are not typically part of the construction contract." The Appraisal of Real Estate at 571. They include the cost of architectural and engineering services, appraisal and legal fees, financing costs such as interest, points, fees or service charges paid on construction loans, and real estate taxes paid during construction. Ibid. Here, the City's appraiser included the 2010 construction loan document in his report. However, that document does not include or detail the cost estimate breakdown. Presumably that estimate was an attachment to the loan document (since there is a reference to its reliance in the loan document) but the same was not provided to the court. Without examining the estimate, the court is unable to determine whether, and to what extent, the engineering firm's cost estimate included indirect costs.

Second, with respect to the renovation of the house in 2015, the City's appraiser isolated certain costs which he identified as being for renovation as opposed to repair. However, he did not include the identified indirect costs such as builder's risk insurance; architectural, structural, and engineering plans; and the cost of permits. Additionally, the cost of demolition should have been included as a direct cost as would a portion of the costs of electrical, plumbing and wiring (pertaining to the newly built ground floor). It is also unclear why he rejected the estimate for stone supply since a significant portion of the same was used to build the new ground floor.

Third, (and assuming the engineering firm's cost estimate included all appropriate indirect costs), the court has an issue with the City's appraiser use of "national update cost multipliers" to trend the cost forward to the valuation dates. "Cost indexes can be used to convert a known cost as of a past date into a current cost estimate." Id. at 583. Generally, historical costs are trended forward when there is difficulty in estimating a property's reproduction cost (due to its special

21

purpose nature or uniqueness) and based on the particular facts of the case. See e.g. Hackensack Water Co. v. Borough of Old Tappan, 77 N.J. 208, 217 (1978); Benefit Facilities Corp. v. Borough of Peapack & Gladstone, 11 N.J. Tax 359, 378 (Tax 1990) ("the most reliable indicator of the value [of a unique village-style office building campus] is the actual cost of construction trended up to the applicable assessment dates"); Merrill Creek Reservoir C/O Proj. Direct v. Township of Harmony, 29 N.J. Tax 487, 496-498 (Tax 2016), aff'd, 461 N.J. Super. 32 (App. Div. 2019) (trending actual historical costs of a 25+ years old water reservoir using a cost estimating service's multiplier was appropriate "under the current facts").[8]  Here, however, as the City's appraiser conceded, the Subject's improvement is not unique or special-purpose even if it is contemporary with certain custom features.  Rather, it is one of the many high-end, custom-built, contemporary-style homes, in Elberon, Deal and Allenhurst, where per the City's appraiser, buyers would not discount custom features when buying a house.  Therefore, using "national update cost multipliers" to trend the Subject's 2010 and 2015 costs to tax years 2017-2019 may not be appropriate. Cf. id., 29 N.J. Tax at 498, n.17 ("'Appraisers who use cost-index trending should recognize that recent costs are more accurate than older costs adjusted with the index.'") (quoting The Appraisal of Real Estate 362 (9th ed. 1987)).

Even if the use of a cost multiplier is appropriate to trend the historical costs of a high-end, customized single-family residence, the City's appraiser's rates are problematic.  There was no information as to the source of, or components of the City's appraiser's "national update cost

_____

[8] In that case, the engineer testified that he "consulted RSMeans historical cost indices, the Consumer Price Index, the Construction Cost Index and the Building Cost Index" with most reliance upon "the RSMeans indices because they dealt specifically with heavy construction, appropriate for a reservoir project," and was particularly appropriate "given the complexity of the project and the inability to ascertain some of the specifics of the construction."  Merrill Creek Reservoir, 461 N.J. Super. at 43-44.

multipliers." It is unknown whether they were obtained from cost estimating services such as M&S. If they were obtained from M&S, then logically those cost multipliers should apply only to the cost estimates developed by M&S, since M&S would be trending or updating only its published cost estimates. Here, however, the City's appraiser specifically rejected use of cost data provided by M&S. Having rejected the M&S cost data, it is difficult to agree that using M&S cost multipliers is appropriate (presuming that the City's appraiser used M&S published cost multipliers, although the same logic would apply if another cost estimating service's multipliers were used but the cost data of that service was not used in the engineering firm's cost estimates provided to the lender in connection with the 2010 construction loan for the Subject).

Also of note is that the cost data provided by M&S generally does not include soft costs used for appraisal purposes. See The Appraisal of Real Estate at 583 (M&S data on "costs do not include" soft costs such as construction loan interest, fees and charges, therefore, "[a]ppraisers should recognize when published cost estimates do not include indirect costs."). In the absence of the whys and wherefores for the use of "national update cost multipliers," the court is not persuaded that the City's appraiser's trended costs are accurate. See id. at 584 (using cost index data can raise issues of the "accuracy of the figures . . . especially when it is not clear which components are included in the data (e.g. only direct costs or direct costs with some indirect costs)").

In sum, without an objective basis for determining the appropriate costs (indirect or direct) of the original construction and subsequent renovation of the improvements on the Subject, the court is unable to determine the current replacement cost of the Subject improvements for tax years 2017-2019. That the inclusion of additional costs or use of reliable and possibly higher cost indexes could provide a higher value conclusion for the Subject does not change the court's

23

conclusion. The potential of a higher value conclusion does not require lenient acceptance of inaccurate data or assumptions, nor implies that the appraiser's value conclusions are credible. The court's duty is to determine true value based on objective and accurate data.

Since one of the two elements in the methodology, estimated replacement cost of the improvements, is inaccurate, the court cannot correctly apply the cost approach to value the Subject. Therefore, it is unnecessary for the court to analyze the reliability of the land value conclusion of the City's appraiser, the other element of the cost approach.[9] See e.g. Union Drydock & Repair v. City of Hoboken, 19 N.J. Tax 207, 212 (Tax 2000) (since the court had "no means . . . to reasonably estimate the value of the subject land, review of [the appraiser's] cost analysis for the subject improvements . . . [was] unnecessary"). Therefore, the court has no alternative but to affirm the assessments.

**CONCLUSION**

For the aforementioned reasons, the assessments for tax years 207-2019 are affirmed. An order and judgment in accordance with this opinion will be issued for each tax year.

Very Truly Yours,

Mala Sundar, J.T.C.

---

[9] "A cost approach has two elements - land value and the reproduction or replacement cost of the buildings and other improvements." Int'l Flavors & Fragrances, Inc. v. Borough of Union Beach, 21 N.J. Tax 403, 417 (Tax 2004).